Al BIERMAN and William Miller,
Plaintiffs,

v.

Samuel MARCUS and Milmar Estate,
Inc., a corporation organized under the
laws of the State of New Jersey, De-
fendants.

**Civ. A. No. 1026–50.**

United States District Court
D. New Jersey.

March 12, 1956.

See also 122 F.Supp. 250.

Robert D. Grosman and Jules E. Tepper, Newark, N. J., for defendant Samuel Marcus.

George Kesselhaut, Newark, N. J., for Al Kevelson.

## MODARELLI, District Judge.

This is an interpleader action filed on December 28, 1950, by Al Bierman and William. Miller against Samuel Marcus and Milmar Estate, Inc.[1] In order to understand the full significance of the matters in dispute in this case, I feel it necessary to make a synopsis of the pleadings in narrative form.

### The Complaint

The complaint alleges that on September 14, 1948,[2] Milmar contracted to sell to Bierman and Miller all of its authorized and issued stock, consisting of 1,250 shares of common stock.[3] The purchase price was $125,000, payable $30,000 cash on September 14, 1948, and $95,000 in deferred payments: $3,000 each month certain premises at Fort Lee, New Jersey, were open for business, and $1,500 each month the premises were closed. On the date of the complaint, the unpaid balance of the purchase price was $35,000 and a payment of $1,500, plus interest, would be due on January 1, 1951; additional payments of $1,500 or $3,000, plus interest, would be due on the first day of each succeeding month. Marcus "* * *" claims that he is entitled to the said $1,500.00 installment and interest, and to all the installments constituting the balance of the purchase price, to wit: $35,000.00, and interest, and demands payment of

Chazin & Chazin, Jersey City, N. J., By: Abraham Chazin and Theodore Chazin, Jersey City, N. J., for plaintiffs.

Maurice C. Brigadier and Seymour Margulies, Jersey City, N. J., for defendant Milmar Estate, Inc.

---

1. The action is based on 28 U.S.C.A. § 1335, which provides for interpleader if "Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim * * *". to be entitled to the money in the possession of the plaintiff. Section 1332 confers original jurisdiction upon the federal district courts in all civil actions " * * * between: (1) Citizens of different States". Plaintiffs allege that Bierman is a citizen and resident of North Carolina; Miller of New Jersey; Marcus of New York; and

Milmar of New Jersey. The jurisdiction of this court will be discussed.

2. See Schedule A attached to this opinion.

3. Exhibit DM–22, a copy of DME–5, the contract, does not contain "up to 50%" in the 5th paragraph, and "at least 50%" in the 10th paragraph. Lieberman testified he called Schwartz and told him of the insertions and Schwartz approved of the same and said he would insert the same in his copy of the contract. Apparently Schwartz failed to do so.

same. Defendant, Milmar Estate, Inc., may claim that it is entitled to the said $1,500.00 installment and interest, and to all the installments constituting the balance of the purchase price, to wit: $35,000.00 and interest." If plaintiffs pay any installment to the defendant not entitled to it, the other defendant might declare an acceleration of the entire balance of the purchase price.[4] Plaintiffs require the protection of this court in order that they will not be compelled to pay the balance of the purchase price twice and to restrain defendants from calling a default and invoking the acceleration clause. Plaintiffs have deposited the $1,500 installment and interest into the registry of the court and have alleged their willingness to deposit the amount of each installment as it becomes due.[5] They demand that the defendants interplead to determine their rights to collect the obligation described in the complaint; plaintiffs also demand a discharge from all liabilities to the defendants.

On December 28, 1950, on plaintiffs' motion the court (1) enjoined the defendants from commencing or prosecuting any legal proceeding affecting the obligation involved in the interpleader action, (2) ordered the defendants (a) to interplead and determine their rights,

(b) not to invoke the acceleration clause of the alleged contract, (c) to show cause on January 15, 1951, why plaintiffs should not be discharged from their alleged liability under the alleged contract and why the injunctions in the order should not be made permanent.[6]

### The Ancillary Claims

Milmar cross-claims against Marcus, demanding judgment that as a result of the September 14, 1948, transaction, Marcus has no right, title, or interest in any Milmar stock certificates issued prior to September 14, 1948; any Milmar stock certificates possessed by Marcus be delivered to Milmar for cancellation; the balance of the proceeds of the condemnation award[7] is the sole property of Milmar and should be delivered and paid to Milmar; an unlawful filing by Marcus of a lis pendens was a malicious use of process for which Milmar demands punitive damages of $100,000, and it was also a malicious abuse of process and a malicious prosecution for which it demands $100,000, and it was also a slander of title for which it demands $100,000, and it was also a malicious interference with a prospective economic advantage for which it demands $100,000.

Marcus filed his responsive pleading on October 25, 1954, in which he cross-

---

4. The alleged contract contains an acceleration clause providing that if the buyer defaults in any payments, the unpaid balance shall become due and certain stock held in escrow shall be returned to the seller.

5. The total original deposit was $1,700. Subsequent to the filing of the complaint, on various dates plaintiffs deposited a total of $34,400 into the registry of the court. Thus, the total fund is $36,100.

6. The return date of the order to show cause was adjourned by consent. Finally, the parties agreed that the issues arising under the order should be determined by the court as part of its final opinion and judgment. Those issues relating to whether certain requirements of the Interpleader Act have been met will be discussed.

7. On February 18, 1954, Marcus applied to the court for the appointment of a receiver to take into possession the proceeds of a condemnation award of approximately $757,410 by the State of New Jersey for the condemnation of lands of Milmar. On that same day the court ordered the money paid to the Peoples Trust Company of Bergen County, Hackensack, New Jersey, and placed on deposit in an account designated "Walter G. Winne, Master of the United States District Court," District of New Jersey, not to be disbursed except by the express order of this court. In the same order, the court ordered $77,500, plus interest, paid to the holder of record of the first mortgage on the condemned lands of Milmar.

claims against Milmar and Al Kevelson,[8] and counterclaims against the plaintiffs. His claims are in the alternative: The September 14, 1948, document is null and void, and there is no contract relating to the sale of any Milmar stock; Lieberman must deliver to him all the stock and all other documents deposited by him pursuant to the September 14, 1948, document;[9] he is the owner and presently entitled to possession of 1,230 shares of Milmar; Bierman, Miller, and Kevelson are not the duly elected officers and directors of Milmar, have no right to act as such and must be restrained from so acting; in the alternative, if the September 14, 1948, document is a contract, $35,000, plus $15,000, must be paid to him; he is the owner and entitled to possession of 630 shares of Milmar stock; Miller, Bierman, Milmar, and Kevelson have defaulted in paying money due him under the September 14, 1948, contract, so that he has the right to the possession of the Milmar stock held by Lieberman as escrowee, who should deliver to him all documents held by him pursuant to that contract. He also cross-claims against Milmar for $46,801.23 allegedly loaned to it.

Bierman and Miller counterclaim against Marcus: The transaction of September 14, 1948, is a valid contract; Marcus has no right, title, or interest in any of Milmar's stock; Marcus is not an officer or director of Milmar; the $50,000 note executed by Miller to Marcus must be cancelled; Bierman, Miller, Milmar, and Bill Miller's Riviera, Inc., must be released from all liability to Marcus, excepting the liability of Miller on the balance of the $15,000 note to Marcus; Marcus is not entitled to the return of any documents held by the escrowee, Lieberman; all documents held by Lieberman pursuant to the September 14, 1948, transaction must be delivered to Bierman and Miller; all of the stock of Milmar is owned as follows: Miller, 40%; Kevelson, 40%; Bierman, 20%; Marcus must deliver to Miller all certificates of stock which he holds.

Kevelson cross-claims against Marcus, alleging essentially the same things as do the plaintiffs against Marcus.

### Issues

As I see them, the legal and factual issues raised by the pleadings and the evidence are: (1) Has the court jurisdiction under 28 U.S.C.A. § 1335?[10] (2) Are Marcus and Milmar "adverse claimants" who "are claiming or may claim to be entitled" to the unpaid balance of the purchase price of the Milmar stock?[11] (3) What substantive law governs the contract claim? (4) Did Bierman, Miller, Milmar, and Marcus on September 14, 1948, contract for the purchase and sale of any amount of Milmar stock owned by Marcus?[12] (5) If there is a contract, was Marcus fraudulently induced to enter into it? (6) Does Milmar owe Marcus any money which he loaned to it? (7) Was Marcus' filing of a lis pendens (a) malicious use or (b) abuse of process, (c) slander of title, or (d) malicious interference with a prospective economic advantage.[13]

---

8. His role in this controversy will be described *infra*. On January 14, 1955, the court granted Marcus' motion to join Kevelson as a defendant to Marcus' counterclaim. The order was based on findings that the counterclaim was a compulsory one over which the court had ancillary jurisdiction and that the joinder did not deprive the court of jurisdiction. The same order denied Marcus' similar motion to join Abraham Lieberman, whose role also will be described.

9. Lieberman holds documents in escrow.

10. See footnote 1, supra.

11. See footnote 6, supra.

12. Is there a contract? If there is, how much stock did Marcus sell?

13. This issue was raised by Milmar's cross-claim against Marcus. Milmar now asks this court to reserve its decision concerning the issue. Accordingly, the decision will be reserved and if Milmar wishes to pursue that cross-claim, briefs must be submitted.

**70**

### (1) Jurisdiction

■ The citizenship of the parties is: Plaintiff Bierman, North Carolina; plaintiff Miller, New Jersey; defendant Marcus, New York; and defendant Milmar, New Jersey. There is diversity of citizenship between the two defendants who allegedly are adverse claimants. But does the co-citizenship of Miller and Milmar jurisdictionally affect the requirement of diversity set forth in 28 U.S.C.A. § 1335? The question is discussed in 3 Moore, Federal Practice, paragraph 22.09, page 3029 (2d Ed. 1948), where Professor Moore notes that Treinies v. Sunshine Mining Co., 1939, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85, does not settle the doubt " * * * whether, under the Interpleader Act, there must be diversity between the complainant and all the claimants, if the complainant has an interest and is not a mere stakeholder * * *." This court agrees with Professor Moore who believes that interpleader relief is proper despite the co-citizenship of a plaintiff with an interest and a defendant who is an alleged claimant. Ibid. The dicta in Boice v. Boice, 3 Cir., 1943, 135 F.2d 919, 920, is not contra. That case also involved a bill in the nature of interpleader. The appellate court affirmed the trial court's order dismissing the complaint which sought interpleader between the defendants. But the court also thought that " * * * the dismissal was right because of an absence of diversity of citizenship between the plaintiff and one of the defendants * * *." Confining that case to its facts, the dicta expresses the court's view that in a case involving a bill in the nature of interpleader where one plaintiff has an active controversy with respect to the subject matter of the suit with one of the defendants whose citizenship is the same as his, the court is without jurisdiction.

Although this is also a case involving a bill in the nature of interpleader,[14] that dicta does not apply. Here there is co-citizenship of plaintiff Miller and defendant Milmar. But not only are there two plaintiffs, one of whose citizenship differs from the two defendants, but further analysis demonstrates the inapplicability of that dicta.

Miller's theory pertaining to Milmar is that he and Bierman purchased all of Milmar's stock. Milmar's theory is the same as Miller's. Thus, there is no "active controversy" between Miller and Milmar. This is so even though the interpleader action was commenced on the ground that since the named seller is Milmar, it "may claim" the unpaid balance of the purchase price of the Milmar stock. But Miller (and Bierman) never have claimed a right to that money. In this case, it is important to distinguish between the phase of the case involving the fund and the controversy concerning the nature of the September 14, 1948, transaction. A similar distinction was made in the Boice case, where the Court of Appeals carefully referred to the plaintiff's " * * * active controversy with respect to the subject matter of the suit with one of the defendants * * *." This general language becomes meaningful by referring to the facts of the case described in the lower court's opinion. D.C.N.J. 1943, 48 F.Supp. 183. In that case, the fund in court resulted from dividends paid to the plaintiff who was formerly a trustee of stock under a declaration of trust. The trust had been terminated, but the stock was still registered in his name. At the time plaintiff commenced the interpleader action, there was a controversy between him and the settlor's wife concerning the right to the stock. Clearly, that plaintiff did not claim any right to the dividends he de-

14. Bierman and Miller are not merely disinterested stakeholders. Clearly they are vitally concerned with the outcome of this action. Although they have never asserted a claim to the unpaid balance of the purchase price of the Milmar stock (see footnote 5, supra) which they have deposited into the registry of the court, their rights concerning the extent of their ownership in Milmar depend upon the court's decision pertaining to the issues raised by their complaint.

posited in court. Thus, the Court of Appeals decided the district court was without jurisdiction because of the plaintiff's active controversy with one of the defendants and both of them were citizens of the same state. But in the case at bar, the two co-citizens (Miller and Milmar) do not have an active controversy with each other, even though one (Milmar) may have had a claim to the unpaid balance of the purchase price of the Milmar stock at the time the action was commenced because it was the named seller.

On the basis of the foregoing, the court concludes that it has jurisdiction under 28 U.S.C.A. § 1335.

### (2) The Interpleader Act

 Previously, the court decided in an order dated March 24, 1953, that Marcus and Milmar are adverse parties. The question arose on a motion by Milmar to strike interrogatories propounded to it by Marcus. The court's order denying the motion was based on its finding that they were adverse parties. And clearly, on the date of the complaint Marcus was claiming to be entitled to the unpaid balance of the purchase price of the Milmar stock, and Milmar as the named seller in the basic document involved in the transaction "may claim" that money. Thus, they are adverse claimants within the meaning of the Interpleader Act.

### (3) Governing Law

 Before discussing the remaining issues, what substantive law governs this action?[15] Kerrigan's Estate v. Joseph E. Seagram & Sons, 3 Cir., 1952, 199 F.2d 694, was an interpleader action. The court held that the substantive law governing the action was the state law in which the federal court sat as that state's court had declared it, citing Klaxon Co.

v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. In the case at bar commenced in this New Jersey federal court, there is a dispute concerning the interpretation of certain documents, which were executed not in New Jersey but in New York. The New Jersey conflict of laws rule is the general rule, viz., the reference regarding questions of validity and interpretation of the obligations of the parties is to the place of contracting.[16] Colozzi v. Bevko, Inc., 1955, 17 N.J. 194, 202, 110 A.2d 545; James H. Rhodes & Co. v. Chausovsky, 137 N.J.L. 459, 462, 60 A.2d 623; Hinkly v. Freick, 86 N.J.L. 281, 283, 90 A. 1108, L.R.A.1916B, 1041. That place is New York. Thus the substantive law governing this action is New York law as the New York courts have declared it.[17]

Before I recite my findings of facts in this case, I should like to make some observations. The case was tried intermittently without a jury over a period of approximately four months, consuming nineteen full trial days beginning January 29, 1955. The transcript is 2,471 pages, in six volumes, and hundreds of documents are in evidence, with no attempt made to abbreviate them so that I should only consider the parts which were pertinent to the disposition of this case. The record is a very long one and its analysis was a tedious and rather unwelcome task because of truths evaded, half truths, half lies, some perjury, faulty recollection of events, of incidents, and conversations which took place some seven years before the trial. Thousands of pages of depositions were taken and were used often to confront witnesses with statements made at the taking of depositions which were irreconcilable with the testimony given at the trial. Many of the characters involved in this litigation might be well characterized as

15. In the sixteen briefs which have been submitted, there is no discussion of the conflict of laws phase of the case.

16. Of course, the threshold question is whether there is a contract. But the documents, whatever may be the legal con-

sequences arising therefrom, were executed in New York.

17. As a result of counsels' disregard of the conflict of laws problem, their briefs contain mainly New Jersey cases.

Damon Runyon types, some of whom had a wholesome disregard for the spirituality of the truth and were actuated in testifying to facts which they thought more helpful to their cause than to establishing the truth of what happened. The record is replete with circumlocutions of the truth and the best that could be said for some of the witnesses is that they had no recollection of what actually happened, and so they said whatever came to their minds while on the stand. These factors made it rather difficult to find the facts, and I have done the best I can to establish the operative facts under the circumstances.

The bringing of this case to trial was characterized by much unnecessary delay. It appears to me from the activity of some of the litigants that it was deliberately planned to delay the trial of the issues. Countless motions were made before the trial and during the trial; may postponements of arguments on the motions were had for one reason or another. I do not find it necessary to specify who the delayers were. Motions were made during the trial for discovery of documents and books in an effort by one of the litigants to bolster up his case. Great inconvenience was caused in searching for documents which had long since been put away. It meant rummaging through countless files and thousands of papers in an effort to find something to bolster up the case, but all in vain. I found it necessary to force the trial on because several of the litigants were thoroughly disgusted with the delay and appealed to me personally over the heads of their counsel. Their appeals were justified. It became necessary during the course of the trial for the production of typewriter experts, which, in my opin-

ion, were absolutely unnecessary. These facts are recited to show the antagonism which prevailed between the litigants and some of which flowed over and affected counsel, who at times became very antagonistic. In such an atmosphere, the court found it difficult at times to get at the true facts.

### The Facts [18]

Bill Miller and Sam Marcus met for the first time in January, 1946. Miller was a well known night-club owner and operator. Marcus was an active entrepreneur in many enterprises and business man principally engaged in the photographic supply business. In April, 1946, they purchased from Michael Realty Co. property located at Fort Lee, New Jersey. The closing statement, dated April 5, 1946, shows that the purchasers were Miller and Marcus. The financing, however, apart from a $300,000 purchase money mortgage, was that Marcus contributed $93,750, Bierman $20,000, and Robert Schwartz $11,250.[19] Miller executed and delivered a $50,000 demand note, dated April 1, 1946, to Marcus.[20] Additionally, Miller later gave Marcus collateral security consisting of all stock issued to Miller in Milmar Estate, Inc., Bill Miller's Riviera, Inc., and Mocambo, Inc.[21] Shortly after the purchase of the property, Milmar Estate, Inc., was incorporated in New Jersey, and Miller and Marcus conveyed title to it. The Milmar stock-book stubs show that prior to September 14, 1948, certificates were issued: On April 15, 1946, 9 shares to Miller, 9 to Marcus, 2 to Marguerite K. Kane; on June 7, 1946, 982 to Miller, 1,107 to Marcus, 125 to Schwartz;[22] on June 7, 1947, 20 shares to Bierman. Milmar's corporate business was that of a

---

18. Since the issues principally involve an interpretation of documents allegedly comprising a contract, the court has been guided in finding the facts by the principles of law set forth infra under Issue (4).

19. Schwartz also was Marcus' attorney.

20. The note was renewed on June 1, 1947, payable $500 weekly, commencing June 1, 1948.

21. Exhibit DME–40.

22. Since the parties included Schwartz' shares as part of Marcus' holdings, in this opinion the court will not separately refer to Schwartz's shares. Schwartz is not a party in this action.

landlord; its tenant was Bill Miller's Riviera, Inc., a New Jersey corporation,[23] whose business was the operation of a fashionable night-club known as "Bill Miller's Riviera."

Both Miller and Marcus were active on-the-scene, continual participants in the affairs and operation of the Riviera night-club enterprise, as evidenced by a letter dated April, 1946, written to Mr. William Miller, signed by Mr. William Miller and accepted by Samuel Marcus. On December 19, 1946, Bill Miller's Riviera, Inc., filed a petition in bankruptcy in the United States District Court for this District. Miller on behalf of the corporation stated in the petition that the corporation was insolvent or unable to pay its debts as they matured; he proposed an arrangement with the corporation's unsecured creditors under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. In the statement of executory contracts, Miller referred to the corporation's lease with Milmar at a yearly rental of $60,000. At the time, the petitioner-corporation owed to Milmar the rent for October, November, and December, 1946. The summary of the corpora-

tion's debts showed $183,982.21, as compared with assets of $27,500. On April 2, 1947, the Referee in Bankruptcy ordered the proposed arrangement confirmed.

When the Riviera failed to pay rent to Milmar, in July, 1947, Milmar commenced dispossess proceedings. The controversy was settled and a new lease was executed.

The Riviera corporation's financial plight adversely affected the income of Milmar.[24] Marcus unsuccessfully attempted several times to sell his stock interest in Milmar. Finally, on July 27, 1948, he sent an option letter to Miller.[25] Although Miller never exercised his option, on August 18, 1948, Marcus gave a document to Miller.[26] Previously, Miller had asked Marcus for a written assurance of his participation in a proposed transaction. Miller wanted such a document to reassure Kevelson, with whom Miller anticipated financing the ultimate transaction; in fact, Miller already had received $5,000 from Kevelson. The contents of the document are set forth in the footnote.[27]

23. Miller was a principal beneficial owner of its stock and actively in control of the corporate operations.

24. Milmar's only income was from Riviera rent. Moreover, Milmar, Miller, and Marcus needed money for their mortgage payments to Michael Realty Co. Despite two helpful modifications of the original mortgage, beginning August 1, 1948, and continuing until July, 1951, their obligation was to pay $5,000 each month.

25. "This is to substantiate our verbal understanding that you are hereby given a ten-day option in which to purchase *my holdings* of the Milmar Estates, Inc., owners of the Riviera property for the sum of $125,000.00 payable $20,000.00 cash and the balance at $4,000.00 per month.

 "Inasmuch as I am dickering with other interested parties, I cannot make any more than a ten-day option at this price and this option expires midnight the 6th day of August, 1948." (Emphasis supplied.)

26. Although the disputed transaction did not occur 'until September 14, 1948,

the prior negotiations are relevant evidence in interpreting the legal consequences of the transaction. This is so because Marcus contends that this court should construe the documents involved in the transaction to mean something else than their words indicate. Under New York law, the parol evidence rule is not thereby violated. O'Neil Supply Co. v. Petroleum Heat & Power Co., 1939, 280 N.Y. 50, 55, 56, 19 N.E.2d 676; 1 Corbin on Contracts, § 22, p. 53 et seq. (1950).

27. "Agreement made this day between William (Bill) Miller hereinafter called party of the first part also known as the buyer and Sam Marcus hereinafter called party of the second part also known as the seller. The party of the first part agrees to purchase *all right title and interest including all outstanding stocks, notes, I. O. U.'s options, agreements and* any other transactions that the party of the second part has participated in with the party of the first part including the agreements in the following company's and corporations.

 "1. William (Bill) Miller

On or about August 26, 1948, Marcus gave another document to Miller.[28] It was a letter in which Bierman offered to buy all of Marcus' shares in Milmar " * * * consisting of approximately 62½% of the outstanding shares (described as all those shares not held by Bill Miller or Al Bierman) for the sum of $125,000 payable as follows: $19,000 on execution of this agreement, receipt whereof is hereby acknowledged. $11,000 upon execution of the necessary papers called for in this agreement. $3,000 each month on the first day of each and every month that the Riviera (or successor)[29] $1500 each month of the first day of each and every month that the Riviera is closed; * * *."

On August 27, 1948, Marcus received two $5,000 checks from Bierman. Marcus signed a receipt for the checks[30] which were a " * * * deposit pending negotiations for the purchase of my [Marcus'] stock of the Milmar Estates, Inc., which includes all outstanding stock excepting that stock owned by William Miller and Al Bierman." The receipt as typewritten contained the figure "$19,000"; "$10,000.00" was inserted in ink and the insertion was initialed by Marcus

and Bierman.[31] This receipt was typed or dictated by Marcus on Riviera stationery.

On or about August 28, 1948, there was a meeting in Marcus' New York City office. The participants were Miller and his attorney Lieberman, Marcus and his attorney Schwartz. There was a discussion regarding the sale to Miller and Bierman of all the interests held by Marcus in Milmar. At the end of the conference Miller and Marcus instructed the attorneys, Lieberman and Schwartz, to prepare an agreement to provide for the sale by Marcus of all his interest in Milmar to Miller and Bierman for $125,000. The attorneys knew the proposed terms of the contract because the three above-described documents were shown to them during the conference.

On September 14, 1948, the same four men met in Schwartz's New York City law office. The purpose of their meeting was to conclude the pending transaction between Miller and Marcus regarding the sale of Milmar stock to Miller and Bierman.[32]

In the basic document the parties are identified as Milmar Estate, Inc., seller,

"2. *Milmar Realty Corp.*
"3. Bill Miller's Riviera, Inc.

"The party of the second part herewith agrees to sell all of the above mentioned assetts which he now claims he is the sole owner and agrees to the following terms of payment for all of the above mentioned items.

"The purchase price for all of the items herein mentioned is One Hundred and Twenty five Thousand Dollars ($125,000.00) to be paid as follows:

"The party of the first part agrees to pay $5000.00 to the party of the second part upon the signing of this agreement.

" Dollars to be paid by the party of the first part to the party of the second part upon final signing of all papers releases and whatever other documents that will be necessary to be signed to release Bill Miller and all of the other companies and corporations herein mentioned.

"The balance of Dollars to be paid as follow:

"First payment of Three Thousand Dollars shall be paid one Month from date the final documents shall be signed and delivered. Thereafter a payment of Three Thousand Dollars shall be made each month that Bill Miller's Riviera shall be open for business. In the period that Bill Miller's Riviera shall be closed and not open for business a payment shall be made each month of One Thousand Five Hundred Dollars.

"Upon the signing of this agreement it shall be a legal and irrevocable contract." (Emphasis supplied).

28. Exhibit DME–2.

29. The sentence is incomplete.

30. Exhibit DME–1.

31. Bierman's deposit was reduced $9,000 because when he produced two $5,000 checks and $9,000 cash, Marcus refused to accept the cash.

32. Miller was authorized by Bierman, who was in North Carolina, to " * * * sign my name to all papers legalizing sale of Milmar Corporation to me."

and Al Bierman and William Miller, buyers. The document recites that Milmar has an authorized and issued stock consisting of 1,250 shares of common stock; "the buyer" (Bierman and Miller) desires to purchase from Milmar all of that stock; Milmar sells to the buyer "* * * all of the issued and outstanding shares of the Corporation."; the price is $125,-000, payable $30,000 cash upon execution of the agreement, $95,000 "* * * by the Purchaser executing a Purchase Money Mortgage on the real estate and chattels, with interest at four (4%) per cent, and containing the following terms: * * *." $3,000 every month that the Fort Lee premises are open for business, $1,500 every month that the premises are closed. Further, it is provided that "The stock up to 50% [33] herein purchased by the Buyer and endorsed in blank shall be deposited in escrow with ABE LIEBERMAN, ESQ. * * * immediately upon the execution of this Agreement with instructions to the said ABE LIEBERMAN to deliver the sale of the said stock to the Buyer upon payment of the full amount due hereunder." The document also contains a default clause, a promise by the buyer to assume a first mortgage, taxes, and insurance debts of Milmar. It is signed on behalf of Milmar by Sam Marcus, President, and on behalf of Bierman by Miller, who also signed his own name.

Other pertinent documents executed by the parties on September 14; 1948, were:[34] (1) A letter addressed to Milmar signed by Miller confirms "our" understanding that Miller will deposit with Lieberman at least 50%[35] "of all of the stock of Milmar Estate, Inc., and 50% of Bill Miller's Riviera, Inc., which shall consist of my own and Al Bierman's." (2) An escrow receipt signed by Lieberman acknowledges that he held certain documents in escrow including "625 shares of Milmar Estates, Inc."[36] (3) A letter signed by Marcus as president of Milmar addressed to Bierman confirms their understanding that Milmar represents that it will pay all of the present outstanding obligations of Milmar "* * * consisting of the corporation's obligations for legal fees or other obligations and loans to Samuel Marcus personally." (Emphasis supplied.)[37] (4) A real estate mortgage by Bierman and Miller as mortgagors, and Milmar as mortgagee, to secure the payment of the $95,000 debt resulting from the basic sale of Milmar stock. The subject matter of the mortgage was land, furniture, fixtures, and equipment then located on the premises as set forth in (5) A chattel mortgage with Bierman and Miller as mortgagors, and Milmar as mortgagee, to secure the payment of the $95,000 debt. It is recited that the goods covered by the mortgage are "* * * mentioned in the schedule hereunto annexed * * *." However, the schedule page is blank.[38] (6) Marcus, acting as president of Milmar, confirmed with Miller their understanding arrived at September 2, 1948, which included "in the event that the contract of purchase, dated September 14th, 1948, is fulfilled, the said note of Fifty thousand ($50,000.00) Dollars is to be returned to you and we agree to

33. "Up to", of course, is imprecise language. Miller, Marcus, and their lawyers, however, in fact did deposit exactly 50% of the stock in escrow.

34. The parties intended all of the documents to constitute their transaction.

35. "At least" also is imprecise language.

36. As will appear infra, 625 shares was 50% of the *then* issued and outstanding shares of Milmar stock.

37. This is another example of the sloppy drafting of the documents in this case.

Obviously, the intention was by Samuel Marcus personally.

38. The two mortgages are of doubtful legality for at the time they were executed the named mortgagors did not own the land or the chattels. Milmar was the owner of the real estate and Bill Miller's Riviera, Inc., of the personal property. When queried as to why these futile documents were drawn, both attorneys replied that Marcus demanded the same.

exchange mutual releases."[39] (7) Statement signed by Miller to the effect that he promised to pay to Marcus $15,000 plus 4% interest, subject to certain conditions.[40] (8) Letter by Miller to Marcus confirming their understanding that all of Marcus' tabs and checks signed by him at the Riviera were cancelled. (9) Two identical letters by Marcus and Schwartz to Milmar: "The undersigned hereby resigns as an officer and director of the corporation, effective immediately." (10) Milmar Estate, Inc., stock certificate Nos. 17, 18, 19, and 20, totaling 1,250 shares. Marcus is named as the owner of the shares; on the rear of each share at the bottom of the printed form of assignment and transfer, Marcus signed his name, although no other handwriting appears thereon. Miller and Marcus agreed that the form of the transaction would be a sale of stock. Neither Miller nor Marcus produced their stock certificates for assignment to the purchasers. Thus, the mechanics of the transaction were that the certificate stubs of the then issued and outstanding shares were marked cancelled, and the parties agreed that the absent certificates would be deemed to have been surrendered back to Milmar. Then the four new certificates totaling 1,250 shares were issued in Marcus' name; he endorsed in blank and delivered the certificates to Lieberman; two certificates representing 625 shares were given to Lieberman to be held by him in escrow, and two certificates representing 625 shares were left with Lieberman apparently in his capacity as Miller's lawyer.[41]

This court has found the above-narrated facts as they are evidenced by the many negotiation documents, those executed during the September 14, 1948, meeting and the believable testimony.

(7) What legal conclusions must be based thereon?

### (4) Is There a Contract? If There Is, What Was Sold?

Marcus has made many arguments relating both to the existence of a contract and the interpretation of any contract held to exist. Thus, based upon research of New York law, the court will set forth the principles of contract law which a New York court would apply to the facts.

■ This court will not make a contract. If the parties intended to enter into a contract, however, the court will attempt to give effect to a transaction that was not only serious, but which is solemnly recorded by many documents signed by the two men who now are the principal disputants.[42] There is no doubt that the parties intended to make a contract. This court is clearly convinced that on September 14, 1948, the parties believed themselves to be making a contract, to be affecting their legal relations with each other. Thus " * * * sound practical policy requires that their mutual expressions should be given an interpretation that will effectuate their belief and intention * * *." Ibid. The court's research of New York law did not disclose any cases contrary to such sound principles.

■■ What was sold under the contract? "It is well settled that in construing the provisions of a contract we should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, we should give to the agreement a fair and reasonable interpretation. * * *" Aron v. Gillman, 1955, 309 N.Y. 157, 163, 128 N.E. 2d 284, 288. The ascertainment of the

---

39. See footnote 20, supra.

40. Miller obligated himself to pay the $15,000 in addition to his obligation under the basic document "in order to sweeten up the deal."

41. Undoubtedly, the documents drafted for the transaction lacked legal craftsmanship. Nevertheless, as will be discussed below, there is no doubt regarding the intentions of the parties.

42. See 1 Corbin on Contracts, § 149, pp. 483, 486 (1950).

substantial intent of the parties is the fundamental rule in the construction of all contracts. Madawick Contracting Co., Inc., v. Travelers Ins. Co., 1954, 307 N.Y. 111, 119, 120 N.E.2d 520. The court ascertains that intent not by a literal reading of the words of the contract, nor by a strict grammatical reading of the words, but by reading them in the light of the circumstances existing at the making of a contract. O'Neil Supply Co. v. Petroleum Heat & Power Co., 1939, 280 N.Y. 50, 55, 56, 19 N.E.2d 676; Wirth & Hamid Fair Booking, Inc., v. Wirth, 1934, 265 N.Y. 214, 219, 192 N.E. 297; Becker v. Peter A. Frasse & Co., 1930, 255 N.Y. 10, 14, 173 N.E. 905. The liberal New York law relating to the interpretation of a contract is shown by Empire Properties Corp. v. Manufacturers Trust Co., 1942, 288 N.Y. 242, 248, 249, 43 N.E.2d 25, 28, "We have said, 'The intention of the parties must be sought for in the language used. To understand the language, we may put ourselves in their place and discern if possible the objects they had in view, and the motives which dictated their choice of words. A wider meaning may thereby be disclosed.' (Halsted v. Globe Indemnity Co., 258 N.Y. 176, 180, 179 N.E. 376, 377.) The object which the parties had in view is, in this case, clear, and so are the motives which dictated their choice of words. The construction which has been placed upon the words the parties have chosen might defeat the object of the parties. The parties have chosen words which leave room for construction. Even literal construction would leave the meaning of the words open to doubt. The courts should then choose that construction which will carry out the plain purpose and object of the indenture."

Applying these principles of interpretation, the court as is suggested by its previous finding of fact concludes that Bierman and Miller purchased *all* of Milmar's stock, consisting of 1,250 shares. The price was $125,000 payable to Marcus: $30,000 cash upon execution of the contract and $95,000 pursuant to the aforementioned installment payment formula. Miller contracted to pay Marcus an additional $15,000, plus 4% interest. Fifty per cent of the 1,250 shares being sold were deposited in escrow with Lieberman, who was to deliver them to Bierman and Miller when they made their final installment payment. Marcus contracted to release Miller from his $50,-000 debt evidenced by his aforementioned June 1, 1947, note. Marcus and Schwartz resigned as officers and directors of Milmar.

Confronted with such evidence concerning the nature and extent of the sale of all Milmar stock, plus his complete withdrawal from active participation in the affairs of Milmar,[43] plus payment to him of $66,004.96 pursuant to the installment payment formula set forth in the contract,[44] litigant-Marcus—compared with seller-Marcus—now asks this court to conclude either that no affirmative legal effect resulted from the documents executed on September 14, 1948, or that he sold only one-half of the total issued and outstanding shares of Milmar. In support thereof, Marcus cites cases which are authority for general and basic principles of contract law, e. g., the terms of the purported contract must be such that their meaning can be ascertained to a reasonable degree of certainty; there must be a meeting of the minds or there is no contract. But they

43. After September 14, 1948, although Miller was continually present at the Riviera night-club, he did not see Marcus again until 1951 when he testified by deposition in this case.

44. Twenty-seven checks are dated from October 1, 1948, to December 1, 1950, to Marcus as payee, signed by either Miller or Kevelson (as president of Milmar) as payor, endorsed (strangely, two are not, although they appear to have been cashed) by Marcus and in amounts identical to the installment payment formula. With but two exceptions, on the face of every check is a computation of the interest and principal, which clearly evidences payments pursuant to the September 14, 1948, contract. And, also pursuant to that contract, the spring-summer-fall checks include $3,000 payments.

are merely conclusions of law applied to the facts of a particular case. As has been discussed, the evidence clearly supports two main conclusions, viz., the parties intended to contract and to sell and buy all of Milmar's stock. Indeed, it was not until after the commencement of this action that Marcus' intent was otherwise, for his conduct prior to that date was that of a man whose legal rights in Milmar had changed.[45]

### (5) Fraud

 Marcus seeks rescission of the contract on the ground that there was " * * * a scheme of fraud on the part of Miller, starting in March 1946, and continuing up to and including the 14th day of September, 1948, designed to give an unconscionable advantage over Marcus." Disregarding Marcus' irrelevant and frivolous arguments, his theory of fraud is based upon his uncorroborated testimony that about August, 1948, Miller falsely represented to him that the Riviera nightclub enterprise was losing money and that he was in danger of losing his entire investment. Under New York law, since Marcus does not seek damages he does not have to prove an intentional misrepresentation. His burden is, however, to prove a (1) misrepresentation, and that (2) it materially influenced the bargain. Bloomquist v. Farson, 1918, 222 N.Y. 375, 380, 118 N.E. 855. It is Hornbook law that in all rescission actions the victim must establish (1) that the defendant was guilty of fraud or misrepresentation, and (2) plaintiff was deceived thereby. There is no proof either that Miller made the statement or that it was false. Even assuming that there was such proof, there is a complete absence of any proof that Marcus was materially influenced or deceived by the misrepresentation. Indeed, the proof is

otherwise, for during the trial this court noted that Marcus had used the opportunity granted to Milmar in its lease with Bill Miller's Riviera, Inc., to examine the books.[46] The court said: "I am convinced that Mr. Marcus knew more about the books prior to September 14, '48, than Mr. Miller will ever know. I can infer that from what I have heard already." The court's opinion has not changed, but, in fact, has been fortified. Marcus tried to create the impression that the Riviera was doing marvelous business. This despite the fact that the evidence discloses that it never paid its rent on time to Milmar, went through bankruptcy, and was constantly in arrears on the payments of interest and installments on the purchase money mortgage. As a matter of fact, the purchase money mortgage mortgagee sold the mortgage at a 15% discount. The evidence further discloses that Marcus had complete access to the books of both the Riviera and Milmar which were kept by Jacob Hoffman, who was Marcus' accountant, not Miller's. Hoffman testified that he reported weekly to both Miller and Marcus as to the business of the Riviera.

Marcus further attempted to prove by mathematical computations purportedly based on an examination of the Riviera's books that the Riviera was earning a profit during the time that Miller allegedly told him it was losing money. The evidence is incomplete, inconclusive, and does not support Marcus' conclusions. Moreover, on July 27, 1948, Marcus sent the aforementioned option letter to Miller.[47] Thus, prior to the time when the alleged misrepresentations were made to him he had already decided not only to sell his interest in Milmar but at a price less than he ultimately received.[48] From these facts it is reasonable to infer that Marcus' decision to sell his Milmar

---

45. See footnotes 43 and 44, supra.

46. "The Landlord shall have an absolute right to check any and all receipts, computations, cash registers, guest checks, billings for each and every book of account maintained by the Tenant."

47. See footnote 25, supra.

48. The option gave Miller the right to purchase Marcus' stock for $125,000. The final contract also called for $125,000, but Marcus and Miller agreed that he would pay an additional $15,000.

stock was not based upon Miller's alleged misrepresentation but was a business decision made with full knowledge of the Riviera's financial status.

### (6) The Alleged Loans

While the parties have raised many issues of fact in this case, none has been more bitterly contested than the issue relating to the money allegedly loaned by Marcus to Milmar. Marcus' cross-claim against Milmar for $46,801.23 is based on his allegation that beginning on July 16, 1946, through September 15, 1948, he loaned $67,997.23 to Milmar and Milmar has repaid him only $21,196. He also alleges that the repayments " * * * became due and payable five years from the 23rd day of July, 1947, and are now due and owing", evidently having in mind the statute of limitations. While there are numerous examples of Marcus' failure to prove the alleged loans, one will suffice for my purpose because it is typical. As evidence of a $5,100 loan on December 28, 1946, he relies upon a page from Milmar's general ledger, journal, and cashbook. The page is entitled "Loans Payable S. Marcus." For the year 1946 it does not contain any $5,100 entry.[49] Not only has Marcus failed in his attempted documentary proof of loans, but his unconvincing testimony relating thereto does not support his contentions. Moreover, during his deposition on December 19, 1951, Marcus repeatedly was asked whether he had any claims against Milmar for money. At that time he didn't know whether he had such claims.[50] The claims were not made until he filed his cross-claim on October 25, 1954. Surely his memory was better in 1951 than in 1954.

The parties were instructed at the conclusion of the trial to submit to the court proposed findings of ultimate facts "with specific reference to where these facts are found in the transcript"[51] because the court realized in a lengthy case of this character where there was so much irreconcilable contradiction in testimony that "fact finding would be a difficult art," as has been stated many times by learned judges. Marcus' proposed findings of fact concerning the loans failed to cite a single reference to the transcript to support his statements. His failure to do so made it necessary for

---

49. Exhibit DM 14, page 10.

50. "Q. I am not asking you about other people. I am asking you specifically whether you have any claims for money against Milmar Estates, Inc.? A. I do not know to whom I have to look for money for claims.
\* \* \* \* \*
"Q. What is your answer? A. My answer is I do not know to whom I have claims for money.
"Q. Mr. Marcus, you are an intelligent man. You understand the question. I am asking you specifically: Do you have any claims for money against Milmar Estates, Inc.? A. And I am answering just as specifically: I don't know to whom I have to look for redress on money.
"Q. Then you do not know whether you have any money claim against Milmar Estates, Inc? A. That's right, I don't know definitely to whom I have to look for money.
"Q. Do you have any other claims against Milmar Estates, Inc.? A. I don't know at this time.
\* \* \* \* \*

"Q. Do you have any money claims against Jacob Hoffman? A. Yes, I do.
"Q. Are they in any way related to Milmar Estates, Inc., \* \* \*? A. No, they are not.
"Q. Do you have any other claims against Jacob Hoffman relating to Milmar Estates, Inc., \* \* \*? A. I don't know at this time.
\* \* \* \* \*
"Q. \* \* \* Do you know of any facts which may give you any claims against Milmar Estates, Inc., \* \* \*? A. I have been advised by my attorneys that the situation is so muddled up that they could give me no advice of any definite character as to what our claims are, against whom the claims are to be instituted. \* \* \*." Deposition upon oral examination of Samuel Marcus, dated December 19, 1951, pp. 95–100.
The excerpts from the deposition of Samuel Marcus were put into the record pursuant to a stipulation made in court. (T. 2468.)

51. T. 2467.

me to read many pages of testimony and to examine countless documents in order to establish the ultimate facts. With the state of the record, it was humanly impossible to find the truth in relation to the loans because there was nothing but hopeless confusion in testimony regarding the alleged loans. Marcus has failed to satisfy me by a fair preponderance of the evidence that Milmar owes him anything.

On the issue of credibility, I should mention that Marcus admitted that he often signed affidavits without reading them. I called his attention to the fact that affidavits were sworn statements, he still said he signed them often without reading them.

It became necessary for Milmar to institute a dower action in the Superior Court of New Jersey against Sarah Marcus, the wife of Samuel Marcus. This action was settled for $7,500. This action was necessitated because the lawyers who handled the transaction did not realize that a wife's right of dower had not been abolished in New Jersey. This was in connection with the transfer of title from Marcus and Miller to Milmar Estate, Inc. Marcus claimed he knew nothing about this action and had nothing to do with it, despite the fact that he and his wife were living together in their matrimonial abode. This is an incredible situation, particularly since Mrs. Marcus was represented by Mr. Roth of the New York Bar who also represented Marcus. As a matter of fact, Mr. Roth sat in during the trial of this case as associate counsel for Marcus and appeared as a witness for him.

An order may be submitted in conformity with the findings of fact and conclusions of law expressed in this opinion.

### Schedule A marked "DME–5"

THIS AGREEMENT made this 14th day of September, 1948, in the City and State of New York between MILMAR ESTATES, INC., a New Jersey corporation (hereinafter referred to as the "Seller"), party of the first part, and AL BIERMAN and William Miller, both residing at Fort Lee, New Jersey (hereinafter referred to as the "Buyer"), party of the second part.

WITNESSETH:

WHEREAS, the corporation is duly organized in the State of New Jersey and has an authorized and issued stock consisting of 1250 shares of Common Stock; and

WHEREAS, the Buyer is desirous of purchasing from the Seller all of the issued and outstanding capital stock of the Corporation;

NOW, THEREFORE, it is mutually agreed as follows:

1. The Seller hereby sells to the Buyer, and the Buyer hereby purchases from the Seller all of the issued and outstanding shares of the Corporation.

2. The price for such shares of stock which the Buyer hereby agrees to pay shall be in the sum of One Hundred Twenty-Five Thousand ($125,000.00) Dollars, payable as follows:

—Thirty Thousand ($30,000.00) Dollars in cash upon execution of this agreement, receipt whereof is hereby acknowledged:

—Ninety-five Thousand ($95,000.-00) Dollars by the Purchaser executing a Purchase Money Mortgage on the real estate and chattels, with interest at four (4%) per cent, and containing the following terms:
Three Thousand ($3,000.00) Dollars each month on the first day of each and every month that the premises in question located at Fort Lee, New Jersey, are open for business. Fifteen Hundred ($1500.00) Dollars each month on the first day of each and every month that premises are closed; and for the purpose of this clause, the question of whether or not the Riviera is open or closed during any given month shall be the state of affairs that prevails

on the first day of each month. The said Purchase Money Mortgage shall be prepared upon the usual forms of any regular title company doing business in the State of New Jersey.

Time is the essence of this contract. The chattel mortgage shall contain a clause providing for a 50% release after every $25,000 shall have been paid.

3. ~~The Seller is authorized to pay all of its outstanding obligations of whatsoever kind and description may be contained upon the corporate books, and to pay over at the closing the surplus remaining, if any.~~

4. The Seller and the Buyer agree that the liquor license will be continued until such time as may be required to transfer and turn over the said liquor license to the Buyer, but without any cost or expense to the Seller.

5. The stock up to 50% herein purchased by the Buyer and endorsed in blank shall be deposited in escrow with ABE LIEBERMAN, ESQ., of 4000 Bergenline Ave., Union City, New Jersey, immediately upon the execution of this Agreement with instructions to the said ABE LIEBERMAN to deliver the sale of the said stock to the Buyer upon payment of the full amount due hereunder.

6. In the event of the Buyer failing to pay the amount due hereunder, or in the event that the Buyer shall default in making any one of the payments due hereunder, then the balance remaining unpaid shall immediately become due and payable, and in such event the shares of stock remaining in escrow shall be returned by the said ABE LIEBERMAN to the Seller.

7. The Buyer agrees to assume and perform all of the outstanding contracts and obligations consisting of first mortgage, taxes and insurance of MILMAR ESTATES, INC. and covenants and agrees to indemnify and hold the Seller and the stockholders of the said Corporation, its officers and directors harmless from and against said claims, ~~demands, liabilities now existing and arising or that~~ ~~may hereafter arise, in connection with any such debts, liabilities, contracts and obligations whatsoever.~~

8. xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx The Buyer agrees not to encumber the property of the Corporation with any mortgages, including chattel mortgages, conditional Bills of Sale, liens or encumbrances of any kind or nature, without the written consent of the Seller first obtained, except as provided in a chattel mortgage.

9. It is understood that no representations have been made by the Seller to the Buyer, as to the value of or the condition of the property of the Corporation, nor as to any other item or thing, except as set forth in this agreement.

10. The Buyer shall have the right to assign this agreement to a New Jersey corporation, without the consent of the Seller, provided, however, that William Miller and Al Bierman shall be the principal stockholders of the said corporation. In the event such new corporation is formed, MILMAR ESTATES, INC., shall not be dissolved but shall be continued in existence. The parties further agree that at last 50% of the shares of stock in the new corporation shall immediately be placed in escrow with ABE LIEBERMAN, ESQ., pending the fulfillment of each and every term of this agreement.

11. All of the terms and conditions contained in this agreement shall survive the transfer of title to the stock called for in this agreement.

12. In the event of condemnation of the property owned by MILMAR ESTATES, INC., all moneys due on the second mortgage will be paid over promptly to the Seller, and the Seller agrees to apply all such amounts received on account of this contract. In the event this contract is assigned, it is a condition of this agreement that the new corporation shall be bound by the terms of this clause.

IN WITNESS WHEREOF, the parties have hereunto set their corporate seals the day and year first above written.

Milmar Estates, Inc.
By: Sam Marcus Pres
 Al Bierman
By: William Miller Atty.
 William Miller.

Attest:

Robt J Schwartz
 Secretary.