EMPIRE PROPERTIES CORPORATION et al., Appellants, *v.* MANU-
FACTURERS TRUST COMPANY, as Trustee, et al., Respondents.

Argued April 15, 1942; decided June 4, 1942.

*David Miller, Harold W. Newman, Jr.,* and *Richard Kelly* for appellants.

*Francis B. Hamlin* and *Emerson F. Davis* for Manufacturers Trust Company, as trustee, respondent. The judgment appealed from properly determined that subdivision b of article 5 of section 9 of the indenture does not warrant or justify the use of bonds previously purchased with principal cash derived from sources other than proceeds of sales, and thereupon previously canceled, in arriving at the required 107 per cent to be delivered up in connection with a sale. (*Heller* v. *Pope*, 250 N. Y. 132; *Graf* v. *Hope Building Corp.*, 254 N. Y. 1.)

LEHMAN, Ch. J. Empire Properties Corporation (Delaware) and the defendants entered into a written indenture of trust dated January 1, 1935. A controversy has arisen in regard to the construction of that indenture. The parties have submitted the controversy to the Appellate Division upon an agreed statement of facts, pursuant to sections 546 to 548 of the Civil Practice Act.

The trust indenture " contemplated," it is agreed, that Empire Properties Corporation (Delaware), sometimes referred to in the indenture as the " Company," should issue thereunder " collateral trust bonds in exchange for an equal aggregate principal amount of certain outstanding bond certificates theretofore issued under eleven certain mortgages, deeds of trust, and indentures of trust, covering eleven apartment house properties in and about the City of New York." Prior to December 31, 1934, the mortgagor corporations, which had executed the mortgages underlying the above-mentioned bond certificates, had failed to pay substantial amounts of interest upon said certificates and had also failed to pay the principal of certain of said bond certificates which had theretofore matured. The trust indenture was executed pursuant to an adjustment plan set forth in a " Deposit Agreement * * * entered into between the Company, Baltimore National Bank, Depositary, and holders of the bond certificates above referred to." Holders of more than ninety-eight per cent of all the bond certificates have, pursuant to said plan, transferred the same to the " Company." The Metropolitan Casualty Insurance Company of New York had, as surety, assumed certain obligations with respect to payment of principal and interest of the bond certificates. By this transaction release from these obligations was granted to the surety upon specified conditions and the surety has complied with those conditions.

The collateral trust bonds issued under the collateral trust indenture bear fixed interest at the rate of two per centum per annum from January 1, 1935, to January 1, 1940, and three per centum per annum from January 1, 1940, to January 1, 1945. The holders of the collateral trust bonds were entitled to receive, also, " additional interest " out of any " excess income " of the trust collateral received by the Company over and above the amount required to pay the fixed interest. The Company was required to use any residue of the excess income remaining after payment of the fixed and the additional income for the redemption or purchase and retirement of collateral trust bonds.

The Company has acquired title to the eleven apartment house properties upon which mortgages underlying the bond certificates had been issued.

In the submission of the controversy the parties have agreed that

" 16. Said Indenture is a vehicle for a salvaging operation which was designed to secure for the holders of the bond certificates referred to in paragraph 7 of this submission the maximum possible recovery upon such bond certificates.

" 17. In aid of said purpose, said Indenture provides in Article V, Section 9 thereof:

" ' No single piece of property (*i. e.*, real property — apartment house) constituting or securing any of the Trust Collateral may be sold if the proceeds of sale thereof are less than the principal amount of the outstanding and uncancelled Bond Certificates as at December 31, 1934, secured by such piece of property unless:

" '(a) The Company shall acquire, at a net cost not exceeding the net proceeds of the sale, a principal amount of Bonds equal to one hundred and seven per cent (107%) of the principal amount of outstanding and uncancelled Bond Certificates secured by such property and pledged with the Trustee hereunder, which Bonds shall be delivered to said Trustee and shall be forthwith cancelled; or

" '(b) There shall be delivered to the Trustee hereunder and forthwith cancelled an amount of Bonds equal in principal amount to the difference between the net sale price to the Company and one hundred and seven per cent (107%) of the principal amount of outstanding and uncancelled Bond Certificates secured by such property and pledged with the Trustee; but, until fixed interest and additional interest shall have been paid in full, none of the earning from the properties shall be used by the Company for the purchase of Bonds.

" '(c) However, if the Trustee hereunder shall have so received and cancelled Bonds in excess of one hundred and seven per cent (107%) of the principal amount of outstanding and uncancelled Bond Certificates pledged with the Trustee secured by all property sold, such excess may be included as part of the Bonds to be delivered up in connection with subsequent sales.'

" 18. The indenture, Article VI, Section 1 (5), provides ' that all principal collections and proceeds of sale received in liquidation of its assets shall be used only for ' the retirement of bonds by purchase or redemption in the manner therein specified. There is no provision in said section or elsewhere in the indenture stating

when such principal collections or proceeds of sale are to be applied to the purchase or redemption of bonds.

" 19. Although the indenture provides that the proceeds of sales and principal collections must be paid over to the Trustee, it confers upon the Company, so long as it is not in default, the discretion to determine the manner of applying such funds to the purchase of bonds. Article IV, Section 9, provides that bonds may be purchased by the Company: ' at any time and from time to time at public or private sale out of any excess income available therefor or out of any cash held as Trust Collateral * * *. Whenever the Company shall direct the application of any cash held as Trust Collateral for the purchase of Bonds at public or private sale, the Trustee shall apply such cash as so directed.'

" 20. The indenture, Article IV, Section 5, provides for the cancellation of all retired bonds, stating:

'Any Bonds and coupons appertaining thereto paid or redeemed or purchased under any of the provisions of this Indenture of Trust shall be cancelled and cremated by the Trustee, and the Trustee shall issue its certificate to that effect to the Company and to the Surety; and no Bonds shall be authenticated or delivered in lieu thereof.'

" 21. In compliance with the provisions of Article V, Section 9 (a) of the indenture, set forth in paragraph 17 of this submission, the Company heretofore has sold for $1,345,000, six of the underlying properties which constituted security for old bond certificates outstanding in the aggregate principal amount of $2,014,893.75. With the aggregate proceeds of said six sales, the Company acquired its collateral trust bonds in the aggregate principal amount of $2,184,170.05 which bonds were thereupon delivered to the Trustee and forthwith cancelled and cremated.

" In addition the Company has purchased and retired, with moneys other than proceeds of sales of the aforesaid six properties, which moneys constituted principal collections as defined in the indenture, additional bonds in the aggregate principal amount of $62,907.02; these additional bonds were from time to time as purchased delivered to the Trustee and forthwith cancelled and cremated."

The Company has " no means or prospects of obtaining in the future, any assets other than the collateral pledged with the Trustee under said Indenture except $1,000 cash capital."

" The five remaining unsold properties owned by the Company constitute the security for old bond certificates outstanding in the aggregate principal amount of $1,072,583.32. These five properties have been appraised in January, 1941, at the aggregate amount of $688,200.

" Deducting from the $3,068,877.07 bonds heretofore issued by the Company the $2,184,170.05 bonds retired with the proceeds of sales of the six properties sold and the $62,907.02 bonds retired with other principal collections, there are now outstanding $821,800 bonds."

The Company desires to sell one or more of the properties that are still unsold. It can do so if the bonds in the principal amount of $62,907.02, which have been purchased with moneys other than proceeds of the sales received from " principal collections," may be included as part of the bonds to be delivered up to the trustee in connection with such sale in accordance with the provisions of the collateral trust indenture. The controversy submitted for decision is whether these bonds may be so included.

The parties have stipulated that " Unless the Company may require the Trustee to approve the application of said $62,907.02 principal amount of bonds as part of the bonds to be delivered up to the Trustee in connection with the contemplated sale of one of said apartment house properties as aforesaid, the Company may be unable to sell said remaining properties, or any of them, *in accordance with the intent and purpose of said Indenture.* The Company does not have an option to purchase any of its bonds at a discount such as it had at the times of the six sales heretofore made." (Italics ours.)

We point out that under the terms of the trust indenture proceeds of sales and principal collections *must* be paid over to the trustee and *must* be used for the purchase of bonds at public or private sale. Though the Company, it is agreed, has discretion to determine " the manner of applying such funds to the purchase of bonds " it has no discretionary power to direct the use of the funds for any other purpose. It is not disputed that if the bonds purchased with

the proceeds of principal collections had been delivered to the trustee at the time of the sale of any property owned by the Company and had been " forthwith " canceled, the amount of the bonds so received and canceled might be " included as part of the Bonds to be delivered up in connection with subsequent sales." Because the Company did not see fit to postpone the use of the proceeds of principal collections for the purposes to which such proceeds *must*, under the trust indenture, be applied, we are told that the canceled bonds may not be so included.

The parties agree that the purpose of the trust indenture was to facilitate the sale of the properties held by the Company so that bondholders might eventually receive as much cash as possible. The parties in article V, section 9, of the trust indenture formulated the conditions under which such sales might be made. The parties have agreed that under the construction which the trustee has placed upon the indenture " the Company may be unable to sell said remaining properties, or any of them, *in accordance with the intent and purpose of said Indenture*."

A written contract " will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (3 Williston on The Law of Contracts, § 618.) Standing alone, the part of the indenture which formulated the condition upon which sales may be made seems ambiguous. Literal construction might sustain the contentions of the trustee. We think that such construction is not justified here. The meaning of a writing may be distorted where undue force is given to single words or phrases. We read the writing as a whole. We seek to give to each clause its intended purpose in the promotion of the primary and dominant purpose of the contract. (*State* v. *Comer*, 176 Wash. 257; *Marx* v. *American Malting Co.*, 169 Fed. Rep. 582.)

We have said, " The intention of the parties must be sought for in the language used. To understand the language we may put ourselves in their place and discern if possible the objects they had in view and the motives which dictated their choice of words. A wider meaning may thereby be disclosed." (*Halsted* v. *Globe Indemnity Co.*, 258 N. Y. 176, 180.) The object which the parties had in view is, in this case, clear, and so are the motives which

dictated their choice of words. The construction which has been placed upon the words the parties have chosen might defeat the object of the parties. The parties have chosen words which leave room for construction. Even literal construction would leave the meaning of the words open to doubt. The courts should then choose that construction which will carry out the plain purpose and object of the indenture.

The judgment of the Appellate Division should be reversed and judgment directed sustaining the contention of the plaintiffs, without costs.

LOUGHRAN, FINCH, RIPPEY, LEWIS, CONWAY and DESMOND, JJ., concur.

Judgment accordingly.