**EMPIRE LAND CORPORATION**

v.

**UNITED STATES of America.**

**Civ. A. No. 77–2762.**

United States District Court,
E. D. Louisiana.

Aug. 2, 1979.

Peter J. Butler, Gayle A. Reynolds, New Orleans, La., for plaintiff.

Jack D. Warren, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

SEAR, District Judge:

Plaintiff, Empire Land Corporation, a Louisiana corporation with its principal place of business in New Orleans, Louisiana, is the successor by merger to Universal Drilling Corporation (Universal), a Delaware corporation which had its principal place of business in New Orleans. Empire sued the United States for a refund of $87,283.57 in corporate income taxes for fiscal 1965 which it alleges were improperly assessed against Universal. Trial was held on June 28, 1979 and the matter was taken under submission.

Universal was incorporated on August 23, 1956, and until its merger into Empire Louis J. Roussel owned a majority of the corporation's stock and controlled its affairs as president. Even though Roussel controlled the corporation, it had approximately 1,000 shareholders by 1965 and was registered with the Securities and Exchange Commission. In its early years Universal's primary enterprise was the design, construction and lease of an offshore drilling barge, the MR. LOUIE. Emile Brinkmann, a civil engineer employed by Universal, designed the barge between 1956 and 1958. As soon as the design and plans were completed Universal began construction of the barge, which became operational by 1959. Primary funding for construction came from Roussel. The MR. LOUIE operated profitably via charter until 1965, when it was sold pursuant to contractual option.

After the MR. LOUIE was completed, Brinkmann began work on plans for other offshore drilling barges. In the early 1960's he completed plans for a barge to be called the MR. BINNINGS, which was similar in design to the MR. LOUIE. Universal was unable to secure a long-term charter for the MR. BINNINGS prior to construction, and because Roussel was no longer willing to advance his own funds for construction, the vessel was never built. By 1965 Brinkmann had also completed two sets of plans for a more advanced vessel to be named the EMILE BRINKMANN, which could drill in water up to 250 feet deep. As with the MR. BINNINGS, Universal could not find anyone willing to enter into a long-term contract for the use of the barge, and the EMILE BRINKMANN was not built either. No other barges were designed for Universal after 1965.

In 1963 Roussel began to search for other businesses in which Universal might engage and so diversify its earnings base. He eventually decided upon the insurance business, and in July, 1963 Universal acquired 90% of the stock of Gulf Union Insurance Co., a small company based in Baton Rouge, Louisiana specializing in life and credit life insurance. The remaining 10% was purchased in March, 1964. Roussel became the President and Chairman of the Board of Gulf Union, whose name was changed to American Benefit Life Insurance Co. Its executive offices were moved to 1500 Amer-

ican Bank Building in New Orleans, which also housed Universal, and the business office was moved to the Cotton Exchange Building in New Orleans, which Universal owned.

American Benefit's revenues averaged between $900,000 and $1,000,000 over the next two years, after which Roussel decided that American Benefit was too small to generate significant profits. He believed that Universal needed to acquire another insurance company which could merge with American Benefit to form a larger, more profitable insurance operation. After several months Roussel determined that Bankers Union Life Insurance Company of Denver, Colorado fit Universal's needs, and on July 30, 1965 Universal's Board of Directors authorized him to acquire Bankers Union and to make the necessary financing arrangements. On August 19, 1965 Universal purchased 58% of Bankers Union stock at a price of $3,085,000, plus a $50,000 commission. Universal paid $135,000 in cash and borrowed the remaining $3,000,000 through demand notes. In the next year Universal repaid $1,500,000 of the loan, although the precise source of those funds cannot be determined from the evidence.

Roussel became Chairman of the Board of Bankers Union and supervised the overall operation of that company, whose executive offices were also moved to 1500 American Bank Building. The business headquarters remained in Denver, and Universal devised a liaison system to coordinate communication between New Orleans and Denver. American Benefit was eventually merged into Bankers Union, significantly expanding and consolidating Universal's insurance operation. Universal continued to operate

Bankers Union until 1971 or 1972, when it was forced to sell the company as a means of generating cash for the payment of federal income taxes.

In addition to its drilling barge and insurance operations, Universal owned the Cotton Exchange Building in New Orleans, which it had purchased from the New Orleans Cotton Exchange in 1962. Through Emile Brinkmann, who served as the building manager, it actively managed the building. Universal was in charge of maintenance and repairs, rentals, insurance, janitorial service and the like. On May 26, 1964 Universal transferred ownership in the building on the public records to a new corporation named Co-ex, Inc. in exchange for 100% of the stock of that company. Brinkmann continued as the building manager, though he was now paid in that capacity by Co-ex, and he continued to take an active role in the operation of the building.[1]

As of July 31, 1965 Universal had never paid a dividend; its total retained earnings for the nine years of operation through fiscal 1965 were $281,867, and for that year Universal reported taxable income of $363,304 and a tax liability of $168,356, which it paid with the filing of the return. Following an audit of Universal's 1965 tax return the Internal Revenue Service determined that Universal owed $87,283.53 in accumulated earnings tax pursuant to 26 U.S.C. §§ 531, 532(a).[2] It based its determination on three factual findings:

(1) Universal was a "mere holding or investment company,"

(2) Universal had retained its earnings and profits beyond the reasonable and reasonably anticipated needs of its business, and

---

1. Brinkmann continued on Universal's payroll in the position of a consultant.

2. 26 U.S.C. § 531 provides:
   "In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income . . . of every corporation described in section 532, an accumulated earnings tax equal to the sum of
   (1) 27½ percent of the accumulated taxable income in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000."
26 U.S.C. § 532(a) provides:
   "The accumulated earnings tax imposed by section 531 shall apply to every corporation . . . formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

(3) one of the purposes for the retention was avoidance of income tax with respect to its shareholders.

Universal paid the accumulated earnings tax and filed for a refund with the IRS. When the refund was disallowed, Empire, its successor by merger, filed this suit.

■ In order for Empire to recover, it must prove both (1) that it was not a mere holding or investment company, and (2) either (a) that it did not unreasonably accumulate earnings or (b) that if it did, it did not do so to avoid taxes with respect to its shareholders. 26 U.S.C. § 533.[3] 26 C.F.R. § 1.533–1(c) defines a holding or investment company as follows:

"A corporation having practically no activities except holding property and collecting the income therefrom or investing therein shall be considered a holding company within the meaning of [26 U.S.C. § 533(b)]. If the activities further include, or consist substantially of, buying and selling stocks, securities, real estate, or other investment property (whether upon an outright or marginal basis) so that the income is derived not only from the investment yield but also from the profits upon market fluctuations, the corporation shall be considered an invest-

ment company within the meaning of [26 U.S.C. § 533(b)]."

When one corporation owns all the stock of another and so in effect operates the other corporation, the business of the former may be considered as including the business of the latter. 26 C.F.R. § 1.537–3(b).[4] Thus, the activities of American Benefit and Co-ex must be considered in determining whether Universal was a holding or investment company.

■ In fiscal 1965 Universal was engaged in three areas of significant non-investment activity. First, it was involved in the design of the drilling barge, the EMILE BRINKMANN, for which Brinkmann completed two detailed sets of plans. It attempted to obtain a long-term charter, which it viewed as a prerequisite for construction, but it was unsuccessful and thus the barge was never built. Nonetheless, the design and marketing efforts did constitute an active business operation. In addition, Universal conducted a life and credit life insurance business through its wholly owned subsidiary, American Benefit Insurance Co. Finally, Universal managed the Cotton Exchange Building through its wholly owned subsidiary Co-ex, Inc. Co-ex was responsible for all maintenance and repair, leased the offices, collected the

---

**3.** 26 U.S.C. § 533 provides:

"EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) *Unreasonable Accumulation Determinative of Purpose.* For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

(b) *Holding or Investment Company.* The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders."

**4.** 26 C.F.R. § 1.537–3(b) provides in relevant part:

"If one corporation owns the stock of another corporation and, in effect, operates the other corporation, the business of the latter corporation may be considered in substance, although not in the legal form, the business

of the first corporation. However, investment by a corporation of its earnings and profits in stock and securities of another corporation is not, of itself, to be regarded as employment of the earnings and profits in its business. Earnings and profits of the first corporation put into the second corporation through the purchase of stock or securities or otherwise, may, if a subsidiary relationship is established, constitute employment of the earnings and profits in its own business. Thus, the business of one corporation may be regarded as including the business of another corporation if such other corporation is a mere instrumentality of the first corporation. That may be established by showing that the first corporation owns at least 80 percent of the voting stock of the second corporation . . . Moreover, the business of one corporation does not include the business of another corporation if such other corporation is a personal holding company, an investment company, or a corporation not engaged in the active conduct of a trade or business."

rents, and employed building personnel. As a company engaged in three active businesses in fiscal 1965, Universal was not a mere holding or investment company.

■ In addition, Universal's accumulation of surplus during fiscal 1965 was reasonable. 26 C.F.R. § 1.537–1(b)(1) provides the guide for determining whether accumulation of surplus is reasonable.

"In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, providing that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of the plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business."

In short, one cannot justify an accumulation of surplus simply by asserting the existence of a future business need. That need must be certain, and there must be some definite plan for the use of the accumulation.

■ In fiscal 1965 there were four specific business needs justifying the accumulation of surplus, and in each case there were definite plans for the use of the accumulation. First, Universal had completed the design of the EMILE BRINKMANN and needed only to obtain a long-term charter to begin construction. While a loan would have provided most of the funding, Universal would most likely have needed to provide some of the funds itself. Second, Universal planned to expand its insurance oper-

ations through the acquisition of Bankers Union Life Insurance Co. On July 30, 1965 the Board of Directors of Universal authorized Roussel to acquire the stock of Bankers Union and to arrange the necessary financing. Less than a month later, on August 19, 1965, Universal purchased 58% of the stock of Bankers Union. Universal needed its surplus both to provide cash at the time of purchase and to help in repaying the $3,000,000 loan it obtained to finance the purchase. Third, Universal needed funds to pay its 1965 tax liability of $168,356. Fourth, on July 31, 1965 there was a lawsuit pending in the Eastern District of Louisiana styled "DeLong Corporation, et al. v. Universal Drilling Company, Inc." C.A. 10,327. Plaintiff in that case sought damages from Universal as a result of its alleged infringement upon certain patents, and Universal needed funds on hand to protect against possible liability stemming from this lawsuit.

The evidence presented at trial shows that Universal was not "a mere holding or investment company," and it also shows that Universal's accumulation of surplus in fiscal 1965 was reasonable in view of its future needs. Therefore, the imposition of the accumulated earnings tax on Universal was not justified, and a refund of the full amount of that tax, $87,283.53, is due to Empire Land Co., Universal's successor by merger. Accordingly, based upon the evidence presented at trial, the argument of counsel and the law, I now enter the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.

Plaintiff, Empire, is a corporation organized under the laws of the state of Louisiana with its principal place of business in New Orleans, Louisiana. It is the successor by merger to Universal, a corporation organized under the laws of the state of Delaware with its principal place of business in New Orleans.

**2.**

In the early years of operation Universal's primary enterprise was the design, construction and chartering of an offshore drilling barge, the MR. LOUIE.

**3.**

Funding for construction of the MR. LOUIE came from Louis J. Roussel, majority shareholder and president of Universal. Upon its completion Universal chartered the MR. LOUIE, which was sold in 1965 pursuant to contractual option.

**4.**

In 1961 or 1962 Emile Brinkmann, a civil engineer employed by Universal, completed plans for another offshore drilling barge, the MR. BINNINGS, which was never built.

**5.**

In 1965 Brinkmann completed two sets of plans for a more advanced drilling barge, the EMILE BRINKMANN. Universal was unable to obtain a long-term charter prior to construction, and as a result the barge was never built.

**6.**

In July, 1963 Universal acquired 90% of the stock of Gulf Union Life Insurance Company, a small Baton Rouge, Louisiana firm specializing in life and credit life insurance. It acquired the remaining 10% in March, 1964.

**7.**

Universal changed Gulf Union's name to American Benefit Life Insurance Company, moved its executive offices to 1500 American Bank Building in New Orleans, which also housed Universal, and moved the business office to the Cotton Exchange Building in New Orleans, which Universal owned. Roussel became President and Chairman of the Board of American Benefit.

**8.**

After two years Roussel decided American Benefit was too small to generate significant profits, and he requested and received permission from Universal's Board of Directors to acquire Bankers Union Life Insurance of Denver, Colorado in order to expand Universal's insurance operations.

On August 19, 1965 Universal acquired 58% of the stock of Bankers Union. It paid $135,000 in cash and financed the remainder via a $3,000,000 loan payable on demand.

**9.**

Roussel became Chairman of the Board of Bankers Union and moved the executive offices to 1500 American Bank Building, from where he supervised the overall operations of the company.

**10.**

By July 31, 1966 Universal had repaid approximately $1,500,000 of the $3,000,000 demand note.

**11.**

In 1962 Universal purchased the Cotton Exchange Building in New Orleans from the New Orleans Cotton Exchange. Through Emile Brinkmann, who served as the building manager, Universal actively managed the building. In 1964 ownership was transferred on the public records to Co-ex, Inc. in exchange for 100% of the stock of that company. Brinkmann continued as building manager and was paid in that capacity by Co-ex.

**12.**

As of July 31, 1965 Universal was the defendant in a patent infringement lawsuit pending in the Eastern District of Louisiana styled "DeLong Corporation, et al. v. Universal Drilling Company, Inc.," C.A. 10,327.

**13.**

As of July 31, 1965 Universal had never paid its shareholders a dividend. Its retained earnings on that date totaled $281,867.

**14.**

In its tax return for fiscal 1965 Universal reported a tax liability of $168,356, which was paid when the return was filed.

**15.**

The IRS assessed an additional $87,283.53 in accumulated earnings tax for fiscal 1965 against Universal.

**16.**

Universal paid the deficiency and asserted a timely claim for refund with the IRS.

After the refund was disallowed, Universal filed the instant action to recover the additional taxes paid.

### 17.

In fiscal 1965 Universal was engaged in three areas of significant non-investment activity:

(1) Design and marketing of the drilling barge, the EMILE BRINKMANN,

(2) Marketing of insurance, particularly life and credit life insurance, through its wholly owned subsidiary, American Benefit Life Insurance Company, and

(3) Operation of the Cotton Exchange Building through its wholly owned subsidiary, Co-ex, Inc.

### 18.

In fiscal 1965 there were four business needs justifying the accumulation of surplus:

(1) The anticipated construction of the EMILE BRINKMANN,

(2) The acquisition of Bankers Union Life Insurance Company,

(3) The payment of the tax liability for 1965 of $168,356, and

(4) The possible liability stemming from "DeLong Corporation, et al. v. Universal Drilling Company, Inc."

## CONCLUSIONS OF LAW

### 1.

The Court has jurisdiction over this action under 28 U.S.C. § 1346(a)(1) [5], and venue in the Eastern District of Louisiana is proper.

### 2.

A company is a holding company if it has practically no activities except holding property and collecting income therefrom or investing therein. If the company's activities also include the purchase and sale of investment property so that income is derived from market fluctuations, it is considered an investment company. 26 U.S.C. § 533(b), 26 C.F.R. § 1.533–1(c).

### 3.

The business of a corporation shall be regarded as including the business of any wholly owned subsidiary. 26 C.F.R. § 1.537–3(b).

### 4.

Since Universal was engaged in three active business enterprises in fiscal 1965, two of them through subsidiaries, it was not a mere holding or investment company. 26 U.S.C. § 533(b), 26 C.F.R. §§ 1.533–1(c), 1.537–3(b).

### 5.

In order for an accumulation of surplus to be reasonable, the needs of the business must justify the accumulation. Those needs must be certain, and plans for the use of the accumulation must be specific, definite and feasible. 26 U.S.C. § 537, 26 C.F.R. § 1.537–1(b).

### 6.

Since Universal had four specific business needs justifying the accumulation of surplus and also had definite plans for the use of that surplus, the accumulation was reasonable. 26 U.S.C. § 537, 26 C.F.R. § 1.537–1(b).

### 7.

Because the accumulation of surplus was reasonable and because Universal was not a mere holding or investment company, the imposition of the accumulated earnings tax was unjustified, and a refund of $87,283.53 is due to Empire Land Company. 26 U.S.C. §§ 531–33, 6611.

### 8.

█ Universal is also due interest on this amount from the date of payment at the rate of 9% per annum. 26 U.S.C. §§ 6611, 6621.

Let judgment be entered accordingly.

---

**5.** 28 U.S.C. § 1346(a)(1) provides:

"(a) The district courts shall have original jurisdiction concurrent with the Court of Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."