**Thomas M. McCARTHY and Margaret Reilly, as Co–Executors of the Estate of Matthew E. McCarthy, Plaintiffs,**

**v.**

**PHILIPPINE NATIONAL BANK, Defendant.**

**No. 82 Civ. 8332 (CSH).**

United States District Court, S.D. New York.

July 14, 1988.

Bigham, Englar, Jones & Houston (Joseph A. Kilbourn, Jeffrey M. Winn, of counsel), New York City, for plaintiffs.

**1324**

Jones, Day, Reavis & Pogue (Carl F. Goodman, of counsel), New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Over a considerable period of time, the late Matthew E. McCarthy, an attorney specializing in tax matters, rendered legal services to defendant Philippine National Bank ("PNB"). Disputes arose between McCarthy and PNB with respect to the former's compensation for legal services. Eventually McCarthy brought suit against PNB in this Court, whose subject matter jurisdiction derives from diversity of citizenship. The complaint asserted claims in *quantum meruit*, and, in respect of tax years 1964–1966, a contract claim arising out of a resolution enacted by PNB's board of directors. Magistrate Joel L. Tyler supervised discovery under this Court's order of reference. McCarthy having died in 1985, after initiation of the action, the claims were prosecuted by his children, Thomas M. McCarthy and Margaret Reilly, as co-executors of McCarthy's estate.

Eventually Magistrate Tyler recommended to this Court that the *quantum meruit* claim be dismissed because of nonproduction and alteration of McCarthy's time sheets. Such documentation lies at the heart of a *quantum meruit* claim for services, in respect both of a claimant's ability to prove the claim, and his adversary's ability to defend against it. In a Memorandum Opinion and Order dated December 17, 1987, familiarity with which is assumed, I adopted Magistrate Tyler's well-reasoned report and dismissed McCarthy's *quantum meruit* claim. That left for trial the contract claim in respect of tax years 1964 through 1966.

That claim was tried to the Court on the basis of agreed facts and documents whose admissibility, for the most part, was conceded. I rejected *in limine* PNB's objections to certain documents. The documents in question, the nature of defendant's objections, and the reasons for my rulings appear in the trial record, and are not reiterated here. Counsel cooperated effectively in presenting the case for resolution, and contributed helpful briefs and oral arguments. What follows constitutes the Court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

### I.

PNB's main office is in the Philippines. However, the Bank engages in international banking. During the pertinent times it maintained a branch office in New York City. In consequence, PNB paid United States income taxes for the tax years in suit, 1964, 1965 and 1966, as well as other years.

McCarthy had represented the New York Branch of PNB in tax matters for a period of years prior to 1969. In 1969 McCarthy filed protests with the Internal Revenue Service ("IRS") with respect to the assessments and deficiencies filed by the IRS against PNB for the tax years 1964–1966.

Correspondence then ensued between McCarthy and PNB with respect to McCarthy's representation of PNB on claims arising out of these tax years.

McCarthy sent a letter dated May 13, 1970 to Mr. Eusebio Villatuya, the acting president of PNB. McCarthy wrote that: "Time is now important in obtaining further conferences at the conference level of the Internal Revenue Service" with respect to tax deficiencies assessed for the New York branch for the years 1964, 1965 and 1966. McCarthy advised PNB that if the deficiencies were not mutually resolved at the conference level, "we will have to proceed to the Appelate [sic] Section of I.R.S., and if unsuccessful there, then to the U.S. Tax Court." McCarthy then discussed the merits of the claims and various strategic considerations. It is apparent that at the time of this writing, administrative expense deductions and interest expense deductions had been disallowed by IRS, and were under discussion between McCarthy and IRS representatives.

McCarthy's May 13, 1970 letter to Mr. Villatuya ends as follows:

"In connection with resolving the present tax deficiencies and considering the overall situation I would recommend that standard legal fees for time spent, etc. be applied to resolving the tax deficiencies assessed to PNB N.Y. by I.R.S. for the years 1964/1966 as aforementioned. For negotiation and resolution of any additional deduction items or additional amounts not previously deducted on the tax returns of 1964/1968 which could result in tax offsets to present tax deficiencies and interest, and could result in tax refunds and interest I would suggest a contingency fee of ⅓rd as to these possible results. Under the circumstances this contingency fee is quite reasonable.

Kindly telex your decision as the hearing time at the conference level is coming to an end shortly."

An exchange of telexes then ensued between McCarthy and a Mr. Medina, identified in the agreed statement of facts as PNB's chief legal counsel. The telexes dealt with McCarthy's fixed rates, and the percentage of a contingency fee if such a fee were to be agreed upon.

On July 14, 1970 McCarthy addressed a memorandum to PNB describing the present status of his discussions with IRS. That memorandum focused upon the disallowed interest deductions. The memorandum concluded with this paragraph:

"Recommended: That inasmuch as interest to be claimed as a deduction will be contested by I.R.S. and the outcome doubtful, a contingency fee be established for any refund based on interest deductions to cover all legal activities in connection with processing this interest claim to its ultimate conclusion."

On August 5, 1970, PNB's board of directors enacted Resolution No. 90, captioned "Attorney's Fees of Attorney Matthew E. McCarthy of New York." That resolution deals with two separate legal matters: a damage suit filed against PNB by the Hoff Research and Development Laboratories, Inc.; and the tax deficiencies assessed by IRS against the PNB's New York branch. In respect of McCarthy's

fees for the latter matter, the resolution summarizes McCarthy's fee applications as follows:

"2. Tax deficiencies of PNB New York Branch:

a) Standard legal fees of $100.00 per hour of senior men and $70.00 per hour for associates for time spent in resolving the tax deficiencies assessed to PNB New York Branch by the U.S. Internal Revenue Service for the years 1964–66.

b) contingent fee of ⅓ for any tax refund based on interest deductions to cover all legal activities in connection with the processing of this interest claim to its ultimate conclusion."

The resolution then undertakes to summarize the issues arising out of the tax deficiencies, a summary reflecting PNB's comprehension of the issues as explained to it by McCarthy. The resolution says:

"B. TAX DEFICIENCIES OF PNB NEW YORK BRANCH

1. The U.S. Internal Revenue Service in examining the tax returns of PNB New York Branch had determined tax deficiencies for the years 1964, 1965 and 1966 totalling $352,112.16 including withholding taxes and penalties of $33,852.20. If these tax deficiencies will be sustained, interest will be added at 6% from the due dates of the tax returns resulting in the additional sums to be paid by the Bank.

2. Deductions made by PNB New York Branch which are still under discussion at the conference level are:

a) Expenses of San Francisco Agency amounting to $96,216.77 for the year 1965 and $129,736.88.

U.S. Internal Revenue Service contends that these are mainly expenses of Head Office in connection with the latter's activities not related to producing income in the United States.

b) Trip expenses totalling $90,272.52 authorized by Head Office.

The U.S. Internal Revenue Service ruled that this is not related to the producing of income in the New York

Branch and also not supported by receipts and vouchers.

3. For 1966, the U.S. Internal Revenue Service disallowed interest expenses amounting to $285,433.52 deducted by New York Branch in its returns.

The reason for the above disallowance was that the average dollar funds in New York Branch which is being claimed by the Bank as interest deductions based on U.S. borrowings by Head Office are not subject to interest expenses as they are in the nature of capital funds of PNB employed in the operations of New York Branch. The U.S. Internal Revenue Service will not accept any interest deductions based on Head Office borrowings in the United States during the years in question because:

a) Head Office turns the dollars borrowed in the United States to the Central Bank receiving pesos which later are turned over to the Central Bank of dollars in meeting the New York Branch dollar requirement. As far as the U.S. Internal Revenue Service is concerned, the pesos turned over to the Central Bank for dollars for the use of New York Branch could come from local peso deposits.

b) Head office never charged New York Branch for interest or any money furnished New York."

As to McCarthy's compensation for legal services, the resolution concluded as follows:

"RESOLVED, That the standard legal fees of $100 per hour for senior men and $70 per hour for associates be made, provided that the total amount shall not exceed $10,000.00; and

RESOLVED FURTHER, That, in view of the enormous work and plentiful legal services required for any tax refund, Atty. McCarthy's contingent fee of ⅓ on any amount that may be refunded to the Bank based on interest deductions, be approved."

A copy of this resolution was communicated to McCarthy, who continued his efforts with the IRS on behalf of PNB.

McCarthy's efforts met with significant success. In September, 1975 he commenced proceedings on behalf of PNB's New York branch in the Tax Court against the Commissioner of Internal Revenue. PNB claimed in those proceedings that there was no deficiency in income tax with respect to the years 1964–1972; and that overpayments of income tax had been made with respect to the years 1964–1968. For the reasons previously stated, the issues at trial are confined to the tax years 1964–1966, and McCarthy's contractual right to compensation arising out of PNB's Resolution No. 90 and subsequent events.

Upon McCarthy's recommendation, PNB and IRS entered into a settlement of Tax Court action. Pursuant to that settlement, in May 1982 McCarthy received five checks from the United States Treasury Department, each payable to "Philippine National Bank c/o Matthew E. McCarthy, 120 Broadway, New York, NY 10005." The amounts of the checks and the tax years to which they were applicable may be summarized as follows:

| Amount | Tax Year |
| --- | --- |
| $124,079.71 | 1964 |
| $237,060.38 | 1965 |
| $396,488.38 | 1966 |
| $ 44,866.34 | 1967 |
| $103,147.74 | 1968 |

Total . . . . $905,633.05

For the years 1964–1966, the above sums were arrived at as follows:

| Year | Tax Overpayment | Interest | Total |
| --- | --- | --- | --- |
| 1964 | $ 55,744.03 | $ 68,335.68 | $124,079.71 |
| 1965 | 109,458.80 | 127,601.58 | 237,060.38 |
| 1966 | 188,291.19 | 208,197.19 | 396,488.38 |

It follows that in respect of the years 1964–66 McCarthy obtained for PNB from IRS payments totalling $757,628.47.

It is undisputed that each of the Treasury checks were dated May 14, 1982, and were characterized by the printed word "Refund."

The parties stipulated that, instead of calling as a witness Joan R. Domike of IRS to explain the manner in which settlement was achieved, a letter she prepared for the office of Regional Counsel, IRS, to the Joint Committee on Taxation in Washington be received in evidence. That letter,

dated August 19, 1981, recites the issues, the IRS evaluation of PNB's claims, and the settlement negotiations. The Regional Counsel observes toward the end of this letter (at p. 22) that "a basis of settlement was sought which would adequately reflect the litigating hazards in this case." The letter then says:

> "The basis of settlement allows approximately one-half of local administrative expenses in all years (in addition to the 3% allowed per notice of deficiency). This allowance results in no deficiencies in all years, and overpayment to the extent of all income tax returned for 1964, 1965, 1966, and 1968 and a small refund for 1967. The total additional deductions per settlement ($4,597,115) amount to less than half the aggregate of local expenses per returns ($9,600,068)."

It thus appears that as litigation and negotiations between PNB and IRS progressed, the focus shifted significantly from interest deductions to include calculations based upon deductions for local administrative expenses. Indeed, it is fair to say from the Regional Counsel's summary of settlement that the refund amounts eventually paid to PNB resulted primarily from arguments IRS accepted in respect of administrative expense deductions. As will be seen *infra*, precisely because that is true PNB now takes the position that McCarthy is entitled to no compensation for these highly effective professional services.

## II.

■ PNB's first contention is that since Resolution 90 granted McCarthy a contingent fee of one-third "on any amount that may be refunded to the Bank based on interest deductions", his only entitlement to compensation arises out of refunds generated by interest deductions. Accordingly, PNB continues, to the extent that its refunds were generated by considerations other than interest deductions, McCarthy was not covered by the contingent fee agreement. And, PNB concludes, since most of the refunds were generated by administrative expense allowances McCar-

thy persuaded the IRS to accept, and McCarthy either has not or cannot allocate between the two for fee purposes, he is entitled to no fee at all.

I decline to place so restrictive a construction upon the contract between the parties.

First, I conclude that in respect of its provisions for compensating McCarthy for tax litigation, Resolution 90 is ambiguous. I have quoted the pertinent language *supra*. ¶ B differentiates between tax deficiencies (¶ B1); deductions for administrative expenses (¶ B2); and deductions made for interest expenses (¶ B3). Under McCarthy's proposal, he was to be paid at a flat rate, in an amount not to exceed $10,000, for time spent in resolving the tax deficiencies. No present controversy arises out of that provision. But the resolution clearly contemplated McCarthy devoting legal services to two kinds of deductions, administrative expense and interest; and the final paragraph of the resolution makes reference to "the enormous work and plentiful legal services required for any tax refund . . ."

While the resolution also refers to an amount that may be refunded "based on interest deductions", a phrase which McCarthy also used in the last paragraph of his memorandum of July 14, 1970 to PNB, the resolution clearly contemplated both the existence of other potentially beneficial deductions that might give rise to refunds, and McCarthy's legal efforts to capitalize upon them.

Accordingly, while both parties contend that the resolution is clear and unambiguous in their favor and adverse to the construction of the other, I conclude without difficulty that the language is ambiguous in respect of the bench marks by which McCarthy's one-third contingency was to be measured.

The parties, in short, "have chosen words which leave room for construction." *Empire Properties Corp. v. Manufacturers Hanover Trust Co.*, 288 N.Y. 242, 249, 43 N.E.2d 45 (1942). That being so, the duty imposed by Chief Judge Lehman's opinion

in *Empire Properties Corp.* devolves upon me:

> "A written contract 'will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.' (3 Williston on The Law of Contracts, § 618.) Standing alone, the part of the indenture which formulated the condition upon which sales may be made seems ambiguous. Literal construction might sustain the contentions of the trustee. We think that such construction is not justified here. The meaning of a writing may be distorted where undue force is given to single words or phrases. We read the writing as a whole. We seek to give to each clause its intended purpose in the promotion of the primary and dominant purpose of the contract. (*State v. Comer*, 176 Wash. 257 [28 P.2d 1027]; *Marx v. American Malting Co.*, 169 Fed.Rep. 582).
>
> We have said, 'The intention of the parties must be sought for in the language used. To understand the language we may put ourselves in their place and discern if possible the objects they had in view and the motives which dictated their choice of words. A wider meaning may thereby be disclosed.' (*Halsted v. Globe Indemnity Co.*, 258 N.Y. 176, 180 [179 N.E. 376]). The object which the parties had in view is, in this case, clear, and so are the motives which dictate their choice of words. The construction which has been placed upon the words the parties have chosen might defeat the object of the parties. The parties have chosen words which leave room for construction. Even literal construction would leave the meaning of the words open to doubt. The courts should then choose that construction which will carry out the plain purpose and object of the indenture." 288 N.Y. at 248–49, 43 N.E.2d 25.

This analysis is so apt to the case at bar that I have quoted it at some length. I accept PNB's suggestion that "literal construction" of certain provisions of the resolution might sustain the Bank's litigation posture. However, there can be no reasonable question concerning the "primary and dominant purpose of the contract" as far as McCarthy and PNB were concerned. PNB was interested in getting money. Most banks are. Surely PNB did not place a higher value, monetary or aesthetic, upon a refund generated by successful negotiations concerning interest deductions than it did upon refunds generated by negotiations concerning administrative expense deductions. Money is fungible. From McCarthy's perception, it is fanciful to suppose that he intended to be compensated for refunds relating to interest deductions, but conceived himself as working for nothing if he obtained refunds for PNB based upon different or alternative theories.

Accordingly I construe McCarthy's original contingent fee agreement as stated in Resolution 90 to apply to any refunds obtained for PNB in respect of tax years 1964–66 by virtue of McCarthy's legal representation. I reject PNB's contention that McCarthy's entitlement is limited to refunds generated by interest deductions.

■ But if I have misconstrued the original contract, it makes no difference in the result. As the tax litigation and negotiations went forward, McCarthy kept PNB and its general counsel closely advised. PNB's counsel suggested faintly that PNB had not been aware of the course the litigation was taking, but the suggestion flies in the face of the contemporaneous documentation and concepts of common sense. Certainly no representative of PNB has come forward to say that the ultimate rationale of the settlement with IRS took the Bank completely by surprise. Accepting that McCarthy has the burden of proof on contested issues of fact, PNB's awareness of contemporaneous events may fairly be inferred from the record, in the absence of any specific rebuttal.

In consequence, what emerges from the record is PNB's awareness of the shifting focuses of the tax litigation; its consent, manifested by silence, that McCarthy continue with whatever arguments or legal strategies seemed promising; and PNB's ultimate receipt of significant tax refunds.

These circumstances call for the application of a principle declared in Professor Corbin's text, and quoted and applied by Judge Pollack of this Court in *Dow Chemical Co. (U.K.) Ltd. v. S.S. Giovannella D'Amico*, 297 F.Supp. 699, 707 (S.D.N.Y.):

> "The Court concludes that it was the intention of the parties to the charter party that Dow International be responsible for the loading operations at Sarnia. Whether this was the meaning the parties gave to the charter party at the time they signed it or whether they sometime later tacitly agreed to this meaning is an irrelevant question under the facts of this case. 'A promisor, even though his promise has been put into clear written words, can always add to it, modify it or wholly replace it by a subsequent tacit agreement, on in which his own promises are found wholly by inference from conduct other than words.' 3 Corbin on Contracts § 564 at p.297 (rev.ed 1960)."

On either approach McCarthy's contingency fee extends to all refunds recovered in respect of the tax years 1964–66.

### III.

■ PNB next contends that the one-third contingency should be applied only to the amounts of the overpayments, but not to the interest generated by the refunded overpayments.

The contention is entirely lacking in merit. The Treasury checks themselves bore the descriptive word "Refund": a refreshing example of the bureaucracy using a word consistent with reality and common sense. PNB stresses IRS documents which indicate, in substance, that the refund checks were made up of two components, overpayments and interest; and that those documents enable us to know with precision the amount of each component. But as counsel for plaintiff correctly observes, the Internal Revenue Code provides in mandatory terms that "interest shall be allowed and paid upon any overpayment in respect of any Internal Revenue Tax.." 26 U.S.C. § 6611(a).

As Judge Weinfeld said in *Citadel Industries, Inc. v. United States*, 314 F.Supp. 245, 247 (S.D.N.Y.1970), "common sense supplies the answer" in cases of this nature. Judge Weinfeld defined "overpayment" in this context as "any payment in excess of that which is properly due." *Id.* at 247–48, citing and quoting *Jones v. Liberty Glass Co.*, 332 U.S. 524, 531, 68 S.Ct. 229, 233, 92 L.Ed. 142 (1947). In the case at bar, PNB unquestionably received such overpayments; and, as noted, the addition of interest to those overpayments was mandatory upon the government. *See also Empire Land Corp. v. United States*, 473 F.Supp. 1289, 1295 (E.D.La.1979).

PNB might have an arguable position if interest on overpayments was discretionary rather than mandatory. In those circumstances PNB could suggest, although the suggestion would be ungrateful, that the wording of the contingent fee agreement did not protect McCarthy in respect of the interest component of a refunded overpayment. However, since under the Code interest automatically accompanies the return of an overpayment, that welcome phenomenon known to the United States Treasury as a "refund" necessarily comprises both elements.

Accordingly I hold that McCarthy's contingent fee agreement embraces the full amounts of the refunds recovered in respect of tax years 1964–66.

### IV.

■ The remaining issue relates to McCarthy's retention of the five Treasury checks in a non-interest bearing account after PNB had demanded a different treatment.

By the time McCarthy received these checks, payable to PNB in his care, in May 1982, disputes had arisen between McCarthy and PNB in respect of his legal fees. Those disputes extended over a number of tax years and services not embraced by the contract claim which formed the subject matter of this trial.

As noted, McCarthy received Treasury checks totalling $905,633.05. McCarthy claimed a charging lien upon those checks pursuant to New York Judiciary Law ¶ 475 and IRS regulations. The text of § 475

appears in the margin.[1] In McCarthy's perception, his entitlement to legal fees exceeded the total amount of the five refund checks. Because the checks were made payable to PNB, McCarthy could not deposit them anywhere. He simply held on to them.

McCarthy received these five checks not later than May 20, 1982. On August 23, 1982 PNB cabled McCarthy, offering to settle all his claims upon payment of $300,000. In the alternative, PNB expressed its willingness:

"... to deposit the full amount of the refund checks in an interest bearing escrow account which would protect your position pending complete resolution of the fee question. The interest would accrue for the benefit of the ultimate distributee of the escrow funds, pro rata. If you continue to refuse to allow the refund checks to be cashed, we must expect a reduction in any fee ultimately paid to you for the amount of the interest you are losing while you hold the refund checks."

McCarthy rejected the $300,000 settlement offer. He continued to hold the checks until PNB asserted a counter-claim against him in the captioned action. On March 9, 1983, following that pleading, the checks were placed in an interest bearing escrow account, arranged in conformity of the safeguards PNB had suggested to McCarthy in August 1982.

The parties debate the effective dates and impact of various provisions in the Code of Professional Responsibility. However, I do not consider that any provision of the Code is squarely dispositive of this issue; nor does the Code undertake to give specific directions or guidance with respect to every dispute that may arise between attorney and client.

I resolve this issue against McCarthy because, in my view, he acted entirely unreasonably in refusing to comply with PNB's sensible and pragmatic suggestion of August 1982. After all, PNB was making a suggestion with respect to what should be done with its money. The refund checks *were* PNB's money, notwithstanding McCarthy's § 475 charging lien. The funds would become McCarthy's money only upon the entry of a judgment in his favor. *Morgan v. Onassis*, 5 N.Y.2d 732, 177 N.Y.S.2d 714, 152 N.E.2d 670 (1958). PNB's escrow suggestion fully protected the interests of both parties. Counsel for McCarthy does not suggest otherwise. PNB had a legitimate concern that these substantial funds not go without the earning of interest during what promised to be a significant period of time, while fee disputes were resolved. Notwithstanding the then existing disputes between attorney McCarthy and his client, and the particular remedy afforded him by the statutory charging lien, I conclude without difficulty that in disregarding PNB's escrow demand, McCarthy breached a general fiduciary duty owing to his client.

Accordingly the judgment to be entered in plaintiff's favor is subject to reduction by a factor reflecting the interest that would have been earned on PNB's share of the funds in question for the period between August 23, 1982 and March 9, 1983. I am encouraged to believe by counsel's pre-trial submissions that they can attend to the necessary mathematics.

## CONCLUSION

Counsel for plaintiffs are directed to settle a judgment consistent with this Opinion on five (5), days notice.

It is SO ORDERED.

---

**1.** From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.